## Staunton.

### J. P. SCOTT, ET AL. v. GEORGE W. JESSEE, ET ALS.

#### September 17, 1925.

1. BOUNDARIES—*Lost Monuments—Finality of Trial Court's Decision on Appeal.*—In the instant case, a proceeding to determine a boundary line, the natural monuments had passed out of existence or were in dispute with the exception of a ridge, the top of which the line was to follow. The trial court found that all the natural objects except the ridge were no longer in existence, and that the evidence introduced by the parties failed to establish with any sort of definiteness where any such objects were located on the ground.

   *Held:* That, in any event, the finding of the trial court was binding on the Supreme Court of Appeals, which, however, after carefully considering the evidence, quite agreed with the conclusion of the court below.

2. BOUNDARIES—*Lost Lines—Reestablishment.*—The rules as to the reestablishment of lost corners apply to the relocation of lost lines. Visible and actual landmarks are to be preferred, but if they cannot be ascertained resort must then be had to the courses and distances, from which no departure should be made except in cases of necessity, when distances will, as a rule, yield to courses.

3. BOUNDARIES—*Lost Lines—Reestablishment—Case at Bar.*—In the instant case, a proceeding to establish a boundary line, where the landmarks, with the exception of a ridge, the top of which the line was to follow, were not in existence, and there was dispute as to, and doubt about, the former location of all other natural objects, in locating the line on the ground the proper course was to locate as near as possible the starting point of the disputed line, and then follow the courses and distances of the survey without departure therefrom.

4. BOUNDARIES—*Lost Lines—Reestablishment—Case at Bar.*—In the instant case, a proceeding to establish a boundary line, the natural monuments, with the exception of a ridge, the top of which the line was to follow, were not in existence.

   *Held:* That error of the trial court in establishing the former location of the starting point of the line was apparent from the fact that the line as reestablished by the trial court did not run along the top of the ridge.

5. BOUNDARIES—*Surveys—Lost Corners—Variations in the Magnetic Needle.*—In renewing lost corners, allowance should be made for variation in the magnetic needle since the date of the original survey, and the courses and distances should not be departed from except when necessary. In making measurements, allowance should be made for unevenness of the ground.

6. BOUNDARIES—*Surveys—Lost Corners—Variations in the Magnetic Needle—Case at Bar.*—In a proceeding to establish a boundary line it was in evidence that the general rule in the community was to allow one degree for every twenty years for variation in the magnetic needle.

   *Held:* That the allowance of a variation of three degrees and twenty-one minutes was proper where the survey was dated in 1848, and the relocation made in 1921.

Error to a judgment of the Circuit Court of Russell county in a proceeding under section 5490 of the Code of 1919 to establish a boundary line. Judgment for defendants. Plaintiffs assign error.

*Amended and affirmed.*

The opinion states the case.

*Burns & Kidd* and *Griffith & Fuller,* for the plaintiffs in error.

*Bird & Lively* and *R. H. Wilson,* for the defendants in error.

CHICHESTER, J., delivered the opinion of the court.

This is an action by J. P. Scott and R. F. Culbertson against George W. Jessee, Charles Hurt and Joseph Jackson, by petition under section 5490 of the Code of Virginia, 1919, to have the true boundary line designated between the lands of the plaintiffs in error, hereinafter designated as plaintiffs as they were in the trial court, and the defendants in error, hereinafter designated as the defendants.

The chief controversy is between Scott and Culbert-son, on the one side, and George Jesse and Hurt on the other. As will be seen later, Jackson can only be slightly affected whatever the decision may be.

In order to make the situation clear, a "sketch" is attached to this opinion, with a "key" thereto, showing (1) the division line adopted by the court, thus — — — — —, (2) the division line contended for by the plaintiffs — — — —, (3) the line according to courses and distances called for by the Gabriel Jessee (predecessor in title to George Jessee and Hurt) survey, and the Emory Thompson (predecessor in title to Scott and Culbertson) survey — — — — — —. The Thompson and Jessee surveys coincide, with a slight exception hereafter noted, and for brevity will be hereafter referred to as the Gabriel Jessee survey.

The line in dispute is the division line between what is designated on the sketch as the Scott land on the one hand and the Jessee and Hurt lands on the other.

The plaintiffs derive their title under a 1,400 or 1,500 acre survey, by deed of September 16, 1878, from Warders by Wm. B. Aston, their agent, to Emory Thompson.

The defendants derive title also from Warders (a source of common title with the plaintiffs) through deed of February 3, 1854, from Aston, agent of Warder, to Gabriel Jessee.

As heretofore said, the deed from Warders to Emory Thompson and the deed to Gabriel Jessee are in perfect accord as to the line in dispute in calls for courses, distances and natural objects (except the call for distance in the line from the two poplar stumps S. 56 E.

is 35 poles, in the Emory Thompson survey, and 38 in the Gabriel Jessee survey, but this is not a matter in dispute).

And so all parties to the controversy agree that the line designated by the Emory Thompson survey and

the Gabriel Jessee survey is the true boundary line between the parties, described as follows: (Gabriel Jessee deed) Beginning at "two small poplars on top of a ridge, corner to Emory Thompson land and with his lines along the top of the ridge S. 56 E. 38 poles to a black oak and dogwood sapling, S. 82 E. 28 poles to a hickory chestnut and maple on a hill side, then down the ridge N. 27 E. 39 poles to Lewis' creek and cross it to a beech and buckeye on its east bank."

So that the dispute here is not as to the location of the line in theory. It is as to the actual location of the line on the ground that the controversy arises.

The case was tried in May, 1925, before a jury, which failed to agree upon a verdict, whereupon all questions of law and fact were submitted to the judge for decision upon the documentary evidence and the stenographic report of the testimony of witnesses. After mature deliberation, the court entered the following judgment: "It is accordingly considered that the case is with the defendants * * * and that the boundary lines in question be and they hereby are established as claimed by defendants, that is to say, that the true boundary lines are as shown by the letters on map filed with the petition and referred to therein and in the notice as beginning at the letter H, thence to G, then along the top of the ridge to F, thence to E, and from E, following the direction of the line from E to D, extended, to the east bank of Lewis creek, the true terminus (beginning at H) of the lines in question being on the east bank of said creek and not as designated at D on said map."

From this judgment a writ of error was awarded, and the case is here for review.

. The evidence consists of the testimony of three surveyors, one V. X. Baldwin, who, testifying for the plaintiffs, had undertaken to locate the true line; and W. E. Dorton and S. N. Taylor, testifying for defendants, who had undertaken to locate the true line; and in addition there were a number of witnesses examined by both sides to the controversy who undertook to establish the existence, or former location, of natural objects called for by the original surveys.

There is a great conflict among the surveyors as to the proper location of the true line and there is great conflict among the other witnesses as to the location of the line and especially as to the former location of natural objects, now gone, called for in the original surveys. It would only unnecessarily prolong this opinion, and serve no useful purpose, to discuss the evidence at length, since the conflicts of evidence were settled by the trial court's decision, and we are dealing here with the single question of relocating a boundary line.

The difficulty in doing this seems to have arisen from two sources—*first*, as to whether any of the natural objects called for in the original surveys are now in existence, or whether their former location is capable of ascertainment; and *second*, as to whether the proper allowance for variation of the magnetic needle has been made by the surveyors employed by the plaintiffs on the one side and the defendants on the other. That is to say, the first issue in dispute is as to whether any of the landmarks or natural objects called for and set out above are still in existence, or, if gone, whether their former location has been ascertained with sufficient certainty for a surveyor to get an accurate starting point in locating the true line.

[1] The poplars are gone, the black oak and dog-

wood are gone, the present existence of the hickory
is in dispute; the maple and hickory are gone, and the
beech and buckeye are gone. The effect of the trial
court's holding, as we must view the case here, is
that all the natural objects, except the ridge, called
for by the original conveyances and surveys, are no
longer in existence, and that the evidence introduced
by the parties, plaintiffs and defendants, fails to estab-
lish with any sort of definiteness where any such ob-
jects were located on the ground. After having care-
fully read the evidence, we quite agree with the learned
judge in this conclusion. Indeed, the findings of the
trial court upon the questions are final as far as this
court is concerned. *Greif* v. *Norfolk & W. R. Co.*,
2 Va. Dec. 600, 30 S. E. 438.

[2] We are engaged here in the relocation of a lost
line. The rules of law governing in such a case are
well and clearly stated in 9 Corpus Juris, p. 177,
section 46 (b), where it is said: "The rules as to the re-
establishment of lost corners apply to the relocation
of lost lines. Visible and actual landmarks are to be
preferred, but if they cannot be ascertained resort
must then be had to the courses and distances, from
which no departure should be made except in cases of
necessity, when distances will, as a rule, yield to
courses."

[3, 4] Here, as pointed out, the landmarks, with the
exception of the ridge, are not in existence, and there is
dispute as to, and doubt about, the former location of
all other natural objects. This being true, we quite
agree with the trial court, in view of the law as applied
to such a situation, that in locating the line on the
ground the proper course was to locate as near as
possible the starting point of the disputed line (the
"two poplars"), and then follow the courses and dis-

tances of the Gabriel Jessee survey without departure
therefrom. We think the court erred in establishing
the former location of the two poplars at G on the map.
This point is on a spur six poles beyond the top of the
ridge, according to the undisputed evidence. The for-
mer location of the two poplars is ascertainable with
approximate accuracy. The white oak stump, H on
the sketch, is still in existence. The white oak tree
which formerly stood there is a call in both the Gabriel
Jessee and Witt-Jackson surveys. The call from the
white oak, according to the Gabriel Jessee survey,
is "N. 7 E. 62 poles to two small poplars on top of the
ridge." Thus there are two natural objects called for,
the two poplars and the top of the ridge. As stated,
the poplars are gone, but there is nothing more un-
changing than the "everlasting hills," and according
to all the evidence in the case sixty-two poles from the
white oak just reaches the top of the ridge, while the
call according to the Jackson survey N. 10 E. 68 poles,
as shown on the sketch, goes beyond the ridge six poles
out on a spur, to reach the point G. Not only is this
true, but the next course is described as a straight line
running along the top of the ridge S. 56 E. 38 p., and
according to the undisputed evidence the line G-F,
run by this course and distance, does not run along
the top of the ridge, while the line from "g," run by
this course, does.

[5] In our view of the case, therefore, starting at the
white oak (H on the sketch) in the relocation of this
disputed line, the courses and distances of the Gabriel
Jessee survey should have been followed throughout,
with due and proper allowance for the variation of the
magnetic needle with regard to the time between the
original survey and its relocation.

"In renewing lost corners, allowance should be

made for variation in the magnetic needle since the date of the original survey, and the courses and distances should not be departed from except when necessary. In making measurements allowance should be made for unevenness of the ground." 9 Corpus Juris, p. 163, sec. 16 (b).

[6] There was some difference of opinion between the surveyor who testified on the one side for the plaintiffs and the surveyors who testified on the other side for the defendants as to the allowance for variation of the magnetic needle. Mr. Dorton, when he undertook to locate the line in 1921, states that he used thirty minutes variation west, and he was locating the disputed line of a survey made in 1854, but admitted that the general rule in that community was to allow one degree for every twenty years. The surveyor, Taylor, made the same allowance. Baldwin, however, using the Thompson title bond dated 1848 when he made his survey in 1921, allowed a variation to the west of three degrees and twenty-one minutes from the original calls.

According to the evidence, the allowance made by the surveyor, Baldwin, was proper for the locality.

Our opinion, therefore, is to amend the judgment of the trial court in the particular above indicated and in all other respects to affirm it.

*Amended and affirmed.*